Next case for argument is Lua v. Miller, and you may proceed. Good morning, Your Honor. I am Bruce R. Fink. I am the attorney for Mrs. Lua. You might want to pull those microphones a little closer. Sometimes it's harder to hear up here. Okay. I am the attorney for Mrs. Lua. I was also her attorney through all of the proceedings except the initial bankruptcy filing, and I took over very early in the game and made some changes to the paperwork even before the 341A. This is not a hard case on the facts. In my view, there is only one fact, one position taken that is alleged as a fact, which is really— So people obviously care about it. People care about it. They care a lot about it. That doesn't make it a hard case. I just wanted to clarify, you're sharing time with amicus for the NACBA? Let me make that— And how many minutes? Right. They get four minutes, and I want to reserve five for rebuttal. Okay. Or any extra amount that I might have left over that I don't use at the opening. All right. We have 15 minutes total, so nine. Okay. Okay. There is one item that is presented as a fact, which I believe is merely an opinion because it's never been judicially determined. It's not a document. In my argument, I'll refer to Mr. Tillum, who is the attorney for the trustee. In references to Tillum, I include the trustee Miller in any such statement, basically, because they are bound at the hip, and the steps taken by one are the steps of both, basically. Mr. Tillum gave me this very nice tie and asked me to put it on the council table. I will leave it to him to explain why it has a relevance to the proceeding or what he's talking about, but I thought that was nice. Nice gesture. Now, the one, quote, fact that may not be a fact is the statement by Mr. Tillum that Miss Lua misled him, dragged him around the maypole by the nose, in essence, and took advantage of him by her superior knowledge and abilities. To that, I would invite the court's attention to the excerpt of record, page 291, and I'm going to read the portion. This is the resume of Mr. Tillum in his application to be employed as the attorney for the trustee. Mr. Tillum regularly speaks before groups of family law attorneys and accountants on bankruptcy law. Recently, he authored, and until early 2006, prepared annual updates for Chapter 16, entitled Family Law Issues, for CEB's book on bankruptcy law. Mr. Tillum is a bankruptcy-certified specialist, as I am. Mr. Tillum writes about family law in the CEB. I don't. I am, however, a certified family law specialist as well. I was born in Michigan, and to the extent that that helps, that's wonderful. I don't. I guess I don't want to totally co-opt your argument, but we don't have a lot of time, and I have some questions that I want to have answered. You will. I mean, first off, starting, it appears the only issue that you raised before the district court was whether the requirements for equitable estoppel were met. Why shouldn't we find that you've waived the other issues raised in your opening brief? I'm not sure that you shouldn't, because I'm going to argue on that issue primarily, because I think on the facts in this case, not the legal issues. I want to stick with the facts, the ones that are real. Okay, well, so if you're going to argue equitable estoppel, and you may have waived the other arguments, which specific one is not met in this case? Well, I believe that Mr. Tillum takes the view that he was misled by Ms. Lua by her changing her exemption to the homestead. Okay, so at what point, if ever, between the first amendment schedule was filed and when the second amended schedule was filed, did Ms. Lua indicate to the trustee that she was considering reasserting a homestead exemption claim? I don't know that she said anything to the trustee. She did exert it, but I don't think she went over to the trustee and said, hey, this is what I'm going to do. She just did it, and she did it. She did it following the court's order, right? She did it following the determination that there was 100% property in which she might have an interest. What she did is this. All through the case, from the beginning on, she said Rigoberto, her husband, owned this house before they were married. He got it with some other relatives originally. She thought he still owned it with the other relatives. Well, didn't she first, she initially claimed she had a 30% interest in the residential property. Yes, that was the rule by the prior attorney. Then, I guess, so that's first. And what changed to make her think that she had no interest in it? Me. The conversation with me, because as a family law attorney, I looked at the situation, and I determined that the husband owned this before they were married. I put in the schedules. The only interest she might have would be the interest it might accumulate to the community if they were getting a divorce, and they were not, at that time, getting a divorce. So I felt she had nothing in there. Maybe I went wrong, but I thought she then amended, because of this bankruptcy court order, that that caused the amendment to say, well, now I have a community property interest. No, what happened was this. In the beginning, and for a long time, she was hands off, it's not mine. Fourteen, then the trustee, Mr. Tillum, files a suit against Rigoberto, who ignores everything. Ultimately, his default is entered, and the prayer of the trustee's complaint was for an accounting, and the court granted an order that the husband was to give the trustee an accounting. And the case was closed. About 14 months later, something happened that I have never seen. I don't know if you've ever seen it. On a case where a judgment has been entered, appeal times have run. Everybody is away from it, and it's over, as far as the judgment, not the enforcement of the judgment. Mr. Tillum goes back to court and says, by the way, Your Honor, I'd like you to change the judgment in this case, not to something weird. I just want you to make the entire property community. Just change the nature of the asset. And that happens. Of course that happens. So what's wrong with my question, which was pretty simple and took a long time to get there, is there's a court order that now gives 100% community property. Am I missing something? No, that's exactly what happened. Okay, well, that's what I tried to ask you about five minutes ago, but I'm just wanting to make sure we're going. Okay, you may want to save the remainder of your time. You've gone past it. Okay. So that means it would be probably appropriate to sit down now. Don't forget your tie. Good morning, Your Honor. Your Honors. I may have placed the court on John Hayes, Simon Resnick and Hayes for the Amici National Association of Consumer Bankruptcy Attorneys. I believe I just used 30 seconds of my four minutes. I personally also believe that this isn't complicated. But the reason I'm here, the reason the NACPA is involved, is it's very scary. It's a very scary case. What the Ninth Circuit says is going to be used by trustees from here on out. Any time the debtor is not cooperative, they're going to say, remember, Lua, we can go after your homestead exemption. That's why. So I've done 1,200 cases probably as a consumer lawyer for the last 30 years. And when you're sitting with the client looking at the papers, on day one, there's decisions that have to be made. We have to list all your property. You have to determine what the value is. And you have to determine whether it's community property or not. So is the gist of what you're trying to say that this is scary is I'm trying to sort of get to the nub of this because there isn't a lot of time. That if a rule is this restrictive and you would be equitably stopped, that debtors would not be able to sort of go with the flow of rulings of the bankruptcy court. And therefore, you know, when something changes, they wouldn't be able to respond to it. And when they might have an exemption, they wouldn't be able to exert it because it changed. Yes, I agree with that. Is that kind of what's scary for you? Yes, and the rule says that the debtor may amend the schedule of exemptions at any time. And this was three years later. Well, what if she said in the beginning that she had 100% interest but didn't exert a homestead and then three years later did? Would that be a different case? Well, that might. If she owned the home and said, I don't want to exempt it, I want to exempt my car. And then later on she said, oh, wait, actually, I changed my mind. I would say that would be more worrisome. But here she actually, through counsel's advice, amended early on to say I don't have an interest, correct? Well, and I'm not surprised at that. It doesn't sound to me like it's community property. Mr. Fink was trying to say that. And that, you know, we get a lot of these where the debtor or the wife is filing by themselves. They're estranged now. It's hubby's house. Well, a mortgage might have been used to make the payments. Maybe some of it's community property, and you know you do your best. What happened in this case is three years later, the court said, really at the trustee's insistence, the court said, this is community property. At that moment, it became something that could be exempted. I know what your answer is going to be, but why would she have claimed it any earlier? Because she didn't have a community property interest. She didn't think she did. It didn't sound like she did, really. Frankly, I'm a little surprised that the trustee didn't. The judgment could have said that hubby's got to turn over some money. He's got to pay us something. We think there's a community property interest. Maybe there isn't. He needs to pay us something. It would have been a money judgment. But once the court declared that this is community property, the debtor went, whoa, well, then I want to exempt. Now I find out. And it's not the debtor's fault. I believe Your Honor asked, what was the representation? There wasn't any. She didn't say, I want to amend my exemptions to take the wild card, which is the wild card is not allowed if you're going to take the home. So you have to choose one or the other. So when she amended to say, I'm going to take the wild card, there was no inference that, and that's it, I'll never change it again. And the trustee, frankly, could have asked that. And the trustee could have said, I'll go after this property. If you tell me you're ever going to change your mind and come back, I'm going to go after this property now. And then she changed her mind, or then. You're cutting into counsel's rebuttal time. Oh, I didn't. I missed the colors. Thank you. It's okay. How much time do I have now? Well, you have a minute and a half, approximately. So we'll now hear from the other side. And then you'll have an opportunity to come back. May it please the Court, my name is David Tillum. I represent the trustee, Alyssa Miller, in this case. And I, too, have handled probably 1,200 consumer cases in the last 30 years. So I, so what? So the scale is even. The scale is equal. And I appreciate Mr. Fink's expertise in family law, because it's pretty clear that under California law, at all times there was a community property interest in this property. And the issue, of course, is how to quantify it, which is why we filed the action that we did for an accounting. So explain to us why you were prejudiced. Because obviously these things go, you know, there's, I asked if she had 100 percent interest in the start and was asserting that and didn't say anything about a homestead until three years later. I think this would arguably be a different case. But since the value of the property was something that was sort of evolving as this bankruptcy, and it sounds like in a certain way, I don't know whether it seems sort of surprising that she would have ultimately gotten 100 percent interest and then she claims it. So why can't debtors have that kind of flexibility? Why, you know, why are you harmed by this? Here's the prejudice, and the question is not unanticipated. Here's the prejudice. The problem is that based on the way the case progressed, had we known that she was going to assert the homestead, had we known that she had owned the property 100 percent at the beginning, we never would have made a deal with the husband. The problem here is the deal that we made with Rigoberto, with Mr. Lua. We made a deal with Mr. Lua based on the state of the record at the time, and the deal was we kind of feel sorry for you. I'm sorry that you didn't bother to participate in the adversary action. You didn't participate. You didn't give us the accounting. You left us almost no choice. We needed to figure out what the debtor's interest was. You didn't give us the evidence. You're talking about Rigoberto. Yes. I'm talking about the adversary action. Yes. In Rigoberto. It has nothing to do with Mr. Lua. Correct. You didn't give us the evidence, and as a result of your not having given us the evidence, we're going to go back to the court and get the court to determine that all of it belongs to the community, and therefore it's all in the bankruptcy estate. So we kind of felt sorry for Mr. Rigoberto. Well, now don't you kind of feel sorry for her? No, I don't, and the reason is because half of the proceeds is still available. If they're getting a divorce, and by the way, we didn't know this until very late in the game. No, but here's the deal. You decide you're going to make you have to go into court because Rigoberto is not playing in the pond about the whole bankruptcy, so you're kind of out there hanging, but you go in and you say the property is 100 percent community, and you asked the court to make that determination or to enter that order, right? Ultimately, we did because we couldn't get the information we needed to do an accounting. Well, but that, you know, that wasn't the only order that could have been admitted. That's the one you wanted. So now the property is by court order, it's 100 percent community. Yes. And she has an opportunity to amend at any time, correct? Yes. And any time certainly comes when she finds out, voila, the court told me it's 100 percent community.  The problem is that by not letting us know. What's the problem? She then went to Rigoberto and said, okay, we're going to give you half of the proceeds. So we made a deal with Rigoberto to give him half of the proceeds, and after we made that deal with the debtor sitting silently and not saying anything, she then pops up and says, oh, and by the way. Well, see, it's not that she pops up. It's that he doesn't pop up. No. I mean, you know, I mean, the difficulty is you decided to make the deal that you made, but you didn't anticipate that she could, based on this, make a homestead claim, correct? Well, I'm not so sure that she could have made the homestead claim because she'd already received the alternative exemptions. She'd already spent the money that she got as a result of those alternative exemptions. But despite that fact, Ms. Lewis sat silently while we made the deal with Rigoberto, while we filed a motion. What's the evidence that she knows all that? We filed a motion. We filed a motion for approval of the settlement. She was served with the notice of the motion. And when was that? You want to date it? It was after the court made the determination that there was 100 percent interest in the property. Well, of course. Okay. So at that point, up to then, she hasn't done anything to lead or mislead you. Correct. But once we make the deal with her. So how is there an estoppel? So basically, just to get it straight, from the time she files and she amended her papers, which her counsel has talked about, from there up until the time the court says 100 percent community property, you're not suggesting she did anything to mislead you or otherwise? No, I'm not suggesting that, although she did at all times assert an interest in the property, no matter which set of schedules you look at. And there were three or four. Even in the beginning, it was 30 percent, and then it was such community property interest as there may be. Okay. So now it's 100 percent community property. And what is it that estops her at this point? Well, what estops her is the fact that we relied on the fact that she did not claim the homestead. We made the deal with Rigoberto. We got it approved by the bankruptcy court. So did you at that point go back to her? I mean, they permit her to amend, correct? Yes. What we did actually throughout this case, and thank you for bringing it back to me, what we did throughout this case was at almost every stage of this case, we went to the debtor and we said, why don't you settle this case? The debtor is not her, correct? She is the debtor. She is the debtor. You're talking about now. You're not talking about Rigoberto? Correct. I'm going back to the debtor. Okay. You're going back to the debtor. We went to the debtor. We said, there's $12,000 worth of debts here. Yeah. Why don't we make a deal? We'll give you some time to pay off the 12th. And the answer was no. Okay. And she doesn't have to settle. She doesn't have to settle. And that's not misleading you in any way. No, it isn't. And then at the next stage of the case. Well, that's not the point. You might not have acted unreasonably, but the question is whether she should be stopped. And I don't see what the prejudice is that she would necessarily have notice of or that she's done anything. The prejudice is that we... That's from having trouble. I'm sorry. The prejudice is that we entered into the deal with the husband based on the fact that there was no exemption claim. At that point. At that point. And had there been an exemption claim, we would never have made a deal with the husband. Instead, we would have honored the homestead exemption, and they would have gone to find... So, really, when you made the deal with the husband, you should have talked with her. We did. We gave her notice of the motion to settle the... No, but notice of the motion is not the same as making sure there's a waiver of any claim. We did not step out and affirmatively request a waiver of the homestead. That is true. Okay. That is true. I'm not sure if that was all of Your Honor's questions. Yeah. Oh, okay. All right. Thank you. So, back to... Well, actually, that was pretty much what I was going to say. I agree with this Court. I actually think this is a pretty narrow case. I think the issue in this case is whether or not the state court, excuse me, the bankruptcy court has the right to rely on and employ state law principles of equitable estoppel when it's considering a state-created exemption. This is not a federal exemption. And in an unbroken line of cases, going back to... Well, I kind of, after hearing both of you argue, I'm sort of anticipating that appellant's counsel, when they were talking about how, you know, how you're so qualified, how he's so qualified, how you all know what you're doing, is... And Ms. Lewis, this sort of unsophisticated person that's listening to her lawyer, that someone was going to make. Well... And it would seem that the two of you are certainly more sophisticated than she is, and perhaps more sophisticated than we are in terms of... So, that's... I don't disagree that this is something that was not anticipated. But on the other hand, that is a basis in Ninth Circuit law, which allows us to rely on and not be prejudiced once the parties have acted in reliance upon the situation. Tell me, so the prejudice is, what do you lose out financially by virtue of this? I mean, who gets hurt? Who gets hurt? All the creditors get hurt. That's who's going to get hurt in this case. So, the function of the bankruptcy is nullified because there's not going to be any money. Half of the money is going to go unless we can reconsider. So, if Ms. Lewis had exerted it before... We would not have made the deal with her husband, and that half of the net proceeds would have... or anything above the homestead, which was $100,000, anything above the homestead would have come into the estate and was available to pay creditors of the estate. And how much did Rigoberto get? He got roughly... Well, he hasn't gotten anything. The money is still sitting and waiting for the decision by this court. It's approximately $125,000. I could be wrong about that. So, her $100,000 homestead and the amount that he got is money that doesn't otherwise go to other creditors. Correct. That's what you're complaining about. Yes, that's correct. So, let's say we agree that equitable estoppel is available... Okay. ...given the application of a state exemption and then state law as to how you play that out within the federal bankruptcy. Yes. Then, of course, we have to walk through whether the court had made an error and how it applied that, correct? That's correct. And I think that the bankruptcy judge laid out an incredibly clear and full explication of how she arrived at that. I can't do a better job of explaining it to Your Honors than she did. I think the judge made her thinking. Am I going to try? Do you want to give time to Amiki? What were you going to give to Amiki? I'm done. Thank you. I was going to split my time, and I've more than used that, so I'm going to yield. You can have the rest. Yes. Thank you very much, Your Honors. First and foremost, thank you for the permission to participate in an oral argument today. The issues that were actually before the district court and also the bankruptcy court really are not something that probably would have prompted an Amika's brief on either side, I think. But, of course, when the debtor filed its appeal to this court and then added a bunch of issues that were not, in fact, decided or even argued to the district court, that's when the NACBA came in and filed its Amika's brief. And, frankly, if it wasn't for the NACBA's brief, I'm not sure that we would have filed ours. Okay. So when I asked counsel for the appellant, I said, you argued equitable estoppel. Why shouldn't we just limit you to that? What do you care about? I agree. We're the ones who brought this issue to the court. We said, you know, to be honest with you, we're not sure that any of these issues are before you. So if we're limited to equitable estoppel and if equitable estoppel is available, do you have any bone to pick with that? No. What I would actually suggest, although I would love a broad, far-reaching opinion that favors trustees nationwide, the judicial officer of the court kind of part of me says this. This is what you should do. You should acknowledge that below, the legal issue of whether or not equitable estoppel actually applies in these circumstances was not litigated. That issue has been waived. And that the only question that you're dealing with here today is whether or not the elements of equitable estoppel were properly applied by the bankruptcy court to these facts. That's a clear error determination in terms of our factual findings. That is, I think, probably what the court should do. I would appreciate it if you do that. I would appreciate it, in your opinion, if you would kind of throw in the caveats that you are not deciding X, Y, and Z in the other issues argued by the parties, including, for example, whether the debtor has an unfettered right to amend the exemptions with which we disagree and, frankly, with respect to which the bankruptcy court ruled in favor of the debtor in this case. The bankruptcy court allowed the debtor to amend their exemptions, even though I'm not sure that was entirely correct. But the trustee hasn't challenged it, so that's definitely not before you. And the other issues raised by NACBA as well as by the debtor, above and beyond the question of the factual application of equitable estoppel, those aren't really before you, in my view. Now, if you would like to go into the higher legal issues, I'm happy to discuss them. I think we've done so pretty well in our brief. I don't want to short-circuit you, and I don't want to suggest we're not always interested in higher legal issues, but it does seem the party's pleadings have narrowed the scope. Well, and frankly, Mr. Fink's statement today, I think, even clarifies it, where he made the point on behalf of the appellant, not on behalf of the amici, but on behalf of the appellant, that the only thing he's really arguing about is the application of the elements of equitable estoppel to the facts. So I do think that it would be prudent for the court to limit any decision in that regard. You have, Judge McEwen, McEwen, I apologize, Dr. McEwen, you have kind of raised the specter of whether or not, of the issue of whether equitable estoppel is actually available under these circumstances, and it's unclear to me whether, that wasn't an argument that was raised below, it's unclear to me whether or not you kind of lumped that with the other extraneous issues or whether you think that's one that's actually been properly raised. I haven't made a decision, of course, I'm reading the briefs, listening to the arguments, but. I think Law v. Siegel is absolutely clear that the scope of an exemption claimed under state law is determined by the state law. That's been consistent with the Erie Doctrine from the 1900s. Well, so, my understanding of the record, well, so, whether the bankruptcy court, if you argue Law v. Siegel, is whether the bankruptcy court properly applied California law regarding equitable estoppel, right? That's correct. And so, Law v. Siegel tells us, I think, quite definitively, that defenses, substantive defenses, under state law, such as equitable estoppel in California, are available in determining whether a debtor is entitled to a homestead exemption, or any exemption, not just a homestead exemption. And we've cited California cases, the judge cited the cases, and we've cited the cases which show that California courts do apply equitable estoppel in the context of homestead exemption claims. So, I think it's clear California does, as a matter of substantive law, California does allow equitable estoppel to stand as a defense. And what concerned my constituency when the brief started coming out was this idea, which we've seen not only in this brief, but also in other cases that have come out since Law v. Siegel, they kind of advocate toward this idea that Law v. Siegel says no equitable defense is ever applied. But that's not what Law v. Siegel says at all. In fact, it says the opposite. It says an equitable offense available under state law is still applicable when the exemption claim is made under state law. I've gone over time, Your Honor. I'm happy to answer any other questions you have. Again, I appreciate the opportunity  Thank you. Thank you. You have about a minute and a half left for rebuttal. All right. Let me get this very clear to you of our position. When the trustee negotiated with Rigoberto, the husband, he made a deal. It's in the documents. It says the trustee will take the property and sell it and control the real estate agent picking and everything else. They will pay certain expenses. They will give Rigoberto half of the sale money, which comes out to be about $120, because there was $240 in all that they received to pay the $9,800 worth of debt. And anything that's left over goes back to you, Rigoberto. Miss Lua, he doesn't get anything. We saw that. We did not object to it, because we still believe that it had been basically his property. For some reason, about 14 months after the deal, after the judgment was entered, and at a time after the deal had been made with the husband, Mr. Tillum stepped over here and said, I'm going to stick my thumb in, and we're going to pull this out, and we're going to take this property that is his and on which we've made a deal to sell it and give him half the money and give him the money back that we don't use up. Your Honor, let's change the judgment. Not enforce the judgment, not bring him down here to do the accounting that the judgment was for. We'll change the judgment to be one to change the nature of the property itself. It was weird. Time to appeal this run. I didn't appeal it. Time to do something about what Tillum has done. He left it that way. And yes, Tillum and I are both smart. Yes. I like a fox here, so you outmaneuvered him on this one. But does your client, the issue is- No, I didn't, Your Honor. Mr. Tillum went, took a gun, and shot himself in the foot all by himself. Well, that's probably a good place to end. Not necessarily crediting your characterization, however. But we will take this under submission, and I thank all counsel and also the amici for your arguments this morning. Lua v. Miller is submitted. I will ask, do we get to have an explanation on the tie? Your choice. But it just kind of left me with some curiosity that has nothing to do with the case. Yes. Your Honor, if you look at the appellant's brief, he characterizes and uses the name as a sign of pleasure or pride. Oh, okay. Oh. Now that makes total sense. I don't know why that was such a mischief. Anyway. I know that you guys have- We credit your sense of humor. All right. The case is submitted. Thank you.
judges: McKeown, Callahan, Quist